Gary HALL, et al., Appellants

v.

**MORTGAGE ELECTRONIC REG-
ISTRATION SYSTEMS, INC.,
et al., Appellees.**

No. 2010–SC–000559–DG.

Supreme Court of Kentucky.

June 21, 2012.

Rehearing Denied Oct. 25, 2012.

Ralph W. Hoskins, Corbin, KY, Counsel for Appellant.

Henry E. Kinser, Mickey Todd Webster, Wyatt, Tarrant & Combs, LLP, Lexington, KY, Counsel for Appellee.

John T. McGarvey, Morgan & Pottinger, P.S.C., Louisville, KY, Counsel for Amicus Curiae.

Opinion of the Court by Justice SCOTT.

This case requires us to determine whether Appellee, Mortgage Electronic Registration Systems, Inc. (MERS) had "good cause" for failing to timely release a satisfied real estate lien it held on Gary and Sharon Hall's property. After a bench trial, the Laurel Circuit Court concluded that the Halls were not entitled to statutory damages because, although MERS filed a release referencing the wrong mortgage, the Halls provided insufficient notice to MERS of the release's actual deficiency; thus, MERS had "good cause" not to file a new release once it checked and found it *had already filed* one. The Court of Appeals affirmed. We granted discretionary review and, because we agree that MERS satisfied the "good cause" requirement under these particular circumstances, we affirm.

## I. BACKGROUND

On April 2, 2004, the Halls executed a mortgage with MERS to secure a loan for the purchase of a tract of land in Laurel County, Kentucky.[1] This mortgage was satisfied in full on May 18, 2005. Six days later, on May 24, MERS prepared the release for recording and mailed a letter to the Halls thanking them for paying the mortgage. The release was subsequently recorded on June 3, 2005, containing the correct mortgagor, mortgagee, and property address. However, the release contained the wrong mortgage book and page number of the mortgage it purported to

release—a simple scrivener's error—causing the release to be ineffective.

On July 25, 2005, the Halls secured a second mortgage on the property with L & N Federal Credit Union ("L & N Credit"). About a week later, on August 2, the attorney for L & N Credit (who is currently representing the Halls in this matter) sent a letter to the Halls informing them that their mortgage with MERS appeared in a title search. The letter asked the Halls for permission to contact MERS on their behalf to get the mortgage released and to clarify L & N Credit's mortgage priority.

When Mr. Hall received this letter, he was aware that MERS had recorded a release with the Laurel County Clerk, but had been told that there was a problem with the release.[2] It is undisputed that the Halls suffered no damages as a result of the scrivener's error in the release and that, despite the error, the Halls obtained the mortgage with L & N Credit.

On August 22, 2005, MERS received a letter from the Halls' attorney, stating in pertinent part:

> It is my understanding that the entire indebtedness of Mr. and Mrs. Hall to MERS and/or Equifirst secured by the *mortgage referenced above* has been paid and satisfied in full yet the mortgage has *not* been released of record.

In response to this letter, MERS personnel searched for the release and found that it had been executed and sent for recording on May 24, 2005.[3] After its search confirmed that a release had, in fact, been

---

1. Household Finance Corporation II actually owned the mortgage note, while MERS was a registration and trading facility that also had the authority to release the mortgage. For simplicity, we refer to Appellees collectively as "MERS."

2. The record does not reflect precisely how Mr. Hall became aware of the problem in the release.

3. Although a copy of the May 24, 2005 letter from MERS to the Halls thanking them for satisfying their mortgage did not indicate whether a copy of the release was enclosed, MERS ordinarily did so as required by KRS 382.365(5).

recorded, MERS took no further action. Nor did the Halls take any further action before filing this lawsuit against MERS on February 1, 2006—after a lapse of more than five months—alleging that, pursuant to KRS 382.365,[4] they are entitled to statutory damages because the lien was not timely released. After the complaint was filed, MERS became aware of the scrivener's error, and filed a corrected release on March 9, 2006.

After holding a bench trial, the trial court concluded that:

> [T]he mortgage in question was satisfied on or about May 18, 2005; that [MERS] filed a fatally defective "First Release Deed"; that the [Halls'] notice to [MERS] was misleading; that [MERS] had "good cause" to not file a new release; and, that the [Halls] had to instigate litigation to secure a proper release of the mortgage.

Consequently, the trial court ruled that the Halls were not entitled to recover statutory penalties under KRS 382.365, but *were* entitled to attorney fees and costs associated with the action.[5] The question, then, is whether they were also entitled to statutory damages.

On appeal, the Court of Appeals agreed that the Halls were not entitled to recover statutory damages. While it disagreed with the trial court's conclusion that the original release was "fatally defective," it nevertheless held that "[t]he Halls did not provide adequate written notice to

[MERS] to correct the release deed, and [MERS's] errors in preparing the release deed meet the 'good cause' requisite for not allowing the imposition of fines in the statute." Accordingly, it affirmed the trial court's judgment that the Halls were not entitled to statutory damages.[6] We subsequently granted discretionary review.

## II. ANALYSIS

The Halls argue that they are entitled to statutory damages because MERS failed to timely record a lien release in violation of KRS 382.365(3) and (4). Specifically, they argue that an improperly filed release is not a release at all, that their written notice to MERS was accurate and fully complied with statutory requirements, and that MERS's negligence cannot constitute the "good cause" required to excuse its noncompliance with the statute.

■ MERS, on the other hand, argues that the Halls' letter failed to provide sufficient notice to trigger a right to recover damages, and that good cause existed to excuse any failure to timely release the mortgage because it did check to see if one was filed but was unaware that it referenced the wrong mortgage.[7] Because the construction and application of a statute is involved, we review *de novo*. *Bob Hook Chevrolet Isuzu, Inc. v. Commonwealth Transp. Cabinet*, 983 S.W.2d 488, 490 (Ky. 1998).

4. Unless otherwise noted, all references to KRS 382.365 refer to that statute as it existed prior to its 2006 amendments.

5. The trial court opined that "KRS 382.365(3) allows recovery of costs and attorney fees independent of assessing statutory damages against a defendant."

6. The Court of Appeals, however, reversed part of the trial court's award of attorney fees

and costs, agreeing with MERS that the Halls were only entitled to fees and costs up to March 22, 2006—the date that MERS entered its corrected second release. That issue has not been appealed to this Court.

7. In so arguing, MERS abandons the argument that it made below, and now essentially concedes that its original release did not effectively release the lien.

The version of KRS 382.365 that was in effect at the time of the events giving rise to this action states in pertinent part:

(1) A holder of a lien on real property ... shall release the lien in the county clerk's office where the lien is recorded within thirty (30) days from the date of satisfaction.

(2) A proceeding may be filed by any owner of real property or any party acquiring an interest in the real property in District Court or Circuit Court against a lienholder that violates subsection (1) of this section. . . .

(3) Upon proof to the court of the lien being satisfied, the court shall enter a judgment releasing the lien. The judgment shall be with costs including a reasonable attorney's fee. If the court finds that the lienholder received written notice of its failure to release and lacked good cause for not releasing the lien, the lienholder shall be liable to the owner of the real property in the amount of one hundred dollars ($100) per day for each day, beginning on the fifteenth day after receipt of the written notice, of the violation for which good cause did not exist.

(4) A lienholder that continues to fail to release a satisfied real estate lien, *without good cause*, within forty-five (45) days from the date of written notice shall be liable to the owner of the real property *for an additional four hundred dollars ($400) per day for each day for which good cause did not exist after the forty-fifth day from the date of written notice, for a total of five hundred dollars ($500) per day for each day for which good

cause did not exist after the forty-fifth day from the date of written notice. The lienholder shall also be liable for any actual expense including a reasonable attorney's fee incurred by the owner in securing the release of real property by such violation.

(Emphasis added.) Because the Halls waited over five months to file suit (wherein MERS was finally alerted to the actual error), the statutory per diem damages at issue are approximately $75,000, irrespective of attorney's fees and costs.

As the Court of Appeals correctly noted, KRS 382.365 essentially requires three conditions to be met before statutory penalties can be assessed: (1) satisfaction of the underlying debt; (2) written notice to the lienholder of its failure to release the mortgage; and (3) lack of good cause for failing to release the mortgage once notice is provided. The first condition is undisputed: the Halls satisfied their mortgage on May 18, 2005. Therefore, our analysis focuses on the second and third conditions.

## A. Written Notice

■ With respect to the second condition, KRS 382.365(3) requires "that the lienholder received written notice of its failure to release. . . ." Here, MERS received a letter stating:

It is my understanding that the entire indebtedness of Mr. and Mrs. Hall to MERS and/or Equifirst secured by the mortgage referenced above has been paid and satisfied in full yet the mortgage has *not* been released of record.

Strictly speaking, this notice complies with the letter of the statute—it provides MERS with written notice that the lien on the Halls' property was not released.[8] We

8. We note here that this litigation could have been avoided altogether had the Halls provided MERS with all of the facts known to them at the time the letter was written—i.e., that a

therefore conclude that the second requirement is satisfied.[9]

## B. Good Cause

With respect to the third condition, MERS is responsible for statutory damages only if it "lacked good cause for not releasing the lien." KRS 382.365(3). MERS argues that "good cause" can be based upon simple human error, such as the scrivener's error at issue in this case. Conversely, the Halls argue that negligence on the part of the mortgagee cannot satisfy the "good cause" requirement. Because the statute neither defines nor otherwise indicates what might constitute "good cause," we must determine what the legislature intended this provision to mean. *See Pullum v. Rhea*, 198 Ky. 294, 248 S.W. 858, 861 (1923) ("[L]ike all highly penal statutes, they will not be enforced unless the facts of the particular case in which they are invoked come strictly within the purpose of the Legislature in enacting it.").

We begin by stating the obvious: the very inclusion of the "good cause" provision indicates that the General Assembly did not intend for this to be a strict liability statute. Rather, the "good cause" provision provides lienholders an affirmative defense to the imposition of statutory penalties.

■ Next, we note that the legislature's failure to define, or provide examples of "good cause" indicates that it is to be determined by the totality of the circumstances. Rather than limit "good cause" to, for example, unforeseeable forces of nature (as the Halls' expert witness testified in support of),[10] it appears that the legislature intended the "good cause" determination to be a question of law for which all relevant circumstances should be considered.

This interpretation is reinforced by the inclusion of the first phrase of KRS 382.365(3): "Upon proof *to the court* ...." The phrase "to the court" did not appear in this subsection prior to the 1998 amendments to the statute. The legislature apparently added it to clarify who, judge or jury, would decide these liability issues under the statute. Indeed, the 1998 addition of the phrase "to the court" coincided with the addition of the first per diem penalties under this statute. Thus, with respect to whether a party is liable for statutory damages, it is clear that the trial

---

release *had* been filed but contained errors that kept it from being effective. The statute, however, only requires notice of the lienholder's "failure to release." KRS 382.365(3). The Halls' letter sufficiently communicated that failure.

9. We recognize that both the trial court and Court of Appeals reached the opposite conclusion. The trial court noted in its "Conclusions of Law" that "[t]he [Halls] were to strictly comply with KRS 382.365(3) and (4) [ ] and failed to do so adequately. The [Halls'] notice to [MERS] of the defective release was misleading to the degree that it purported to inform [MERS] that no release was ever filed." While the Halls' letter would mislead reasonable minds into believing that it was purporting that *no* release had been filed, and it is undisputed that the letter, *in*

fact, misled MERS into that belief, the notice strictly complied with the statute by notifying MERS of its failure to release the lien.

10. The Halls expert witness, Bruce Orwin, testified that, in his opinion, examples of "good cause" would include Hurricane Katrina blowing the mortgagee's office away or a fire burning down its office, so as to logistically prevent it from releasing a lien within thirty days. However, we believe that if the General Assembly had intended "good cause" to be limited to unforeseeable acts of God, it would have said so in the statutory language. *See, e.g.,* KRS 243.650 ("In case of destruction by an act of God ..."). Moreover, failure to timely release a lien for either of the examples provided by Orwin would be more accurately described as "impossibility," rather than "good cause."

judge initially determines what constitutes "good cause" as a matter of law.[11]

In this case, the trial court determined that "good cause" existed on two separate grounds: (1) the Halls' notice letter insufficiently advised MERS of the actual deficiencies in its first release; and (2) the scrivener's error created a legitimate controversy between the Halls and MERS regarding whether the release was filed at all, and if it was, whether it was accurate. We have already determined that the Halls' notice letter complied with the statutory requirement of informing MERS "of its failure to release" the lien; thus, it cannot, in and of itself, provide the "good cause" required to absolve MERS of liability.[12] Therefore, we must decide whether simple human error can be the basis for "good cause" as that phrase is used in KRS 382.365(3) and (4).

The Court of Appeals case of *Wolter v. U.S. Bancorp* supports the position that simple human error can form the basis for a "good cause" defense. 2003–CA–002788–MR, 2004 WL 2984882 (Ky.App. Dec. 23, 2004). In *Wolter*, the borrowers were owners of a lake resort whose variable rate loan excused payments during the winter low season for their business. *Id.* at *1. Due to variations in the interest rate on the loan, it was discovered that the original payment schedule was insufficient to pay off the obligation. *Id.* To avoid a balloon payment upon maturity, the parties agreed to a modification of the loan. *Id.* "However, the modification agreement contained a calculating error in the amortization schedule that was not discovered until after the final payment." *Id.* Nevertheless, after the final payment, the bor-

rowers demanded that the lending bank release the lien securing the obligation, but the bank refused. *Id.* The borrowers thereafter filed suit to obtain release pursuant to KRS 382.365. *Id.*

The trial court in *Wolter* ultimately ruled that the borrowers had satisfied the loan in full, but denied recovery of statutory penalties under KRS 382.365, finding "good cause" excused the bank's failure to release the lien. *Id.* at *2. The Court of Appeals affirmed, holding:

> The [trial] court correctly observed that a legitimate controversy existed. Therefore, good cause as contemplated by the statute supported the bank's refusal to release the lien under the circumstances. Since the competing legal positions were not resolved until entry of the judgment, the [borrowers] were not legally entitled to a release of the mortgage. Thus, there was no untimely release of the mortgage in this case. The court properly held that the [borrowers] were not entitled to damages pursuant to the provisions of KRS 382.365.

*Id.* at *3. Accordingly, in *Wolter*, a simple human calculation error created a good faith dispute which provided the requisite "good cause" that prevented the borrowers from recovering statutory damages. We approve of the Court of Appeals' sound reasoning in *Wolter*.

The Halls, however, point us to the case of *Bank of America v. Boone National Bank*, No. 2004–CA–002422–MR, 2006 WL 504999 (Ky.App. Mar. 3, 2006). In *Bank of America*, the satisfied mortgagee bank, Bank of America (BOA), prepared a lien

---

11. Moreover, having a judge decide the issue of "good cause" allows for meaningful appellate review, because the judge's decision will be reflected in a judicial order with findings of fact and conclusions of law.

12. That is not to say, however, that the misleading nature of the notice letter is entirely irrelevant with respect to the "good cause" determination.

release and a check for the county clerk, but no release was ever filed and the check was never cashed. *Id.* at *1. BOA attempted to argue that the sheer size of its business, 540,000 satisfied loans nationwide in 2001 alone (and over 5,400 in Kentucky), and the general success of its release system "should be deemed a good cause for its rare, inadvertent failure to process a release. . . ." *Id.* at *2.

Although the Court of Appeals did not specifically decide whether this excuse would provide the requisite "good cause,"[13] the human error in *Bank of America* is clearly distinguishable from the human error in the case before us. The error in *Bank of America* was the bank *losing* the release. It was undisputed that no release was filed, timely or otherwise, even *after* notice had been received of its failure to release the lien. Here, on the other hand, MERS timely prepared and recorded a release, albeit with a scrivener's error which went undetected. Clearly, *Bank of America* is an example of when simple human error does not provide the basis for the "good cause" requirement. As noted, however, the facts in the case before us are distinguishable.

■ After careful consideration, we agree with the courts below and hold that, in certain circumstances, human error can form the basis upon which "good cause" exists for failure to timely release a lien under KRS 382.365. *See, e.g., Wolter,* 2004 WL 2984882. We further agree with the courts below that under the totality of circumstances presented by this case, MERS had good cause for its failure to timely file a release. We disagree, however, with the courts below as to what constitutes "good cause" in this case.[14]

Our conclusion that MERS satisfied the "good cause" requirement is formed by the two obvious purposes behind the General Assembly's enactment of this statute: ensuring prompt action by lienholders after satisfaction of an underlying debt, and maintaining accurate property records. First, it is indisputable that MERS took overwhelmingly prompt action—less than one week—in preparing the release, and thanking the Halls for satisfying their loan.

Second, although the statute places no affirmative duty on borrowers to assist lenders in ensuring that accurate property records are maintained, it likewise does not permit borrowers to collect windfall judgments precipitated, in large part, by their withholding of information (albeit unintentional) which would have resolved the matter quickly. The statute was clearly designed to penalize unacceptable behavior, not to penalize those that take further action to resolve the matter but overlook another fact uncommunicated. Adopting the position urged by the Halls would encourage such vague notices, while allowing statutory per diem penalties to accrue before filing suit. We decline to adopt such a position for a statute whose primary purpose is to get the matter resolved as quickly as possible.

Instead, we repeat here that the "good cause" determination is to be made on a case-by-case basis, under the totality of the circumstances. In this case, MERS prepared and timely filed a release. Ignorance of a simple scrivener's error, however, misled MERS, once it received the

---

**13.** Instead, the court held that even if this justification *was* plausible (without deciding the issue either way), BOA still failed to effect a release even *after* receiving notice of its failure to timely do so.

**14.** As previously noted, the courts below found "good cause" in the allegedly insufficient and misleading notice provided by the Halls.

initial notice, into believing that it released the lien. The Halls, on the other hand, knew of the scrivener's error and believed that it rendered the lien release ineffective. They therefore provided MERS with a notice that, although legally sufficient, contributed to MERS's mistaken belief that it had filed an effective release.

Under the circumstances, MERS did the responsible thing and checked its records to confirm that a release had, in fact, been filed. Unfortunately, it did not take the extra step of insuring the release's contents referenced the correct mortgage for an effective filing. Yet, this release did not prevent the Halls from securing a second mortgage with L & N Credit, or otherwise cause them any ultimate harm, other than costs and attorney's fees, for which they were compensated.

In light of the foregoing, we hold that under the totality of the circumstances, MERS established "good cause" for failing to timely release the Halls' mortgage.

### III. CONCLUSION

In sum, we conclude that the Halls are not entitled to statutory damages pursuant to KRS 382.365. We therefore affirm the judgment of the Court of Appeals.

All sitting. MINTON, C.J.; ABRAMSON and CUNNINGHAM, JJ., concur. SCHRODER, J., dissents by separate opinion in which NOBLE and VENTERS, JJ., join.

SCHRODER, J., Dissenting:

The majority acknowledges that through a scrivener's error (the wrong book and page numbers were inserted in the mortgage release), the MERS mortgage was *not* released of record. When the proper-

ty owners sought to refinance, the MERS mortgage appeared as a cloud on the title. The property owners' attorney notified MERS that although the MERS mortgage was paid in full, it was not released of record. MERS confirmed with its personnel that a release had been sent but failed to check the accuracy of the release. MERS never notified the property owners or their attorney that it believed a valid release had been recorded, nor did the property owners' attorney volunteer to MERS the errors in the release that MERS had prepared.

When the property owners did file suit against MERS for a release, and for statutory damages under KRS 382.365 for an untimely release, MERS filed a corrected release but resisted the statutory damages contending good cause existed for the untimely release-the failure of the property owners to notify MERS of the defects in the release. The trial court, the Court of Appeals, and a majority of this Court all agree with MERS that the failure of the property owners to notify MERS of the defects in the mortgage release was good cause to not impose the statutory fine. I disagree because that rationale improperly shifts the burden of procuring a mortgage release onto the property owners instead of the mortgage company—where the statute places the burden.[15]

NOBLE and VENTERS, JJ., join.

---

**15.** The statutory damages may appear high on their face, but the amount is set by the Gener-

al Assembly.