# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued May 6, 2008        Decided August 26, 2008

No. 07-7113

MCKESSON CORPORATION, ET AL.,
APPELLEES

v.

ISLAMIC REPUBLIC OF IRAN,
APPELLANT

Appeal from the United States District Court
for the District of Columbia
(No. 82cv00220)

*H. Thomas Byron III*, Attorney, U.S. Department of Justice, argued the cause for *amicus curiae* United States of America in support of appellant. With him on the brief were *Jeffrey S. Bucholtz*, Acting Assistant Attorney General, *Jeffrey A. Taylor*, U.S. Attorney, and *Douglas N. Letter*, Attorney.

*Thomas G. Corcoran, Jr.* argued the cause for appellant. With him on the briefs were *Laina C. Wilk* and *Henry M. Lloyd*.

*Mark N. Bravin* argued the cause for appellees. With him on the brief were *Peter Buscemi*, *Thomas J. O'Brien*, and *Mark R. Joelson*.

Before: TATEL, GARLAND, and GRIFFITH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* GRIFFITH.

GRIFFITH, *Circuit Judge*: In this long-running dispute, now before us for a fifth time, McKesson Corporation alleges that the state of Iran unlawfully expropriated its investment in an Iranian dairy company. In this appeal, Iran raises a number of challenges to the latest decisions of the district court. We hold that the district court properly asserted subject matter jurisdiction, but reverse its conclusion that the treaty provides a cause of action and its refusal to reconsider its earlier ruling that customary international law does so as well. We remand for further proceedings consistent with this opinion.

## I.

The facts of this case are set forth fully in our previous decisions. *See Foremost-McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 440–42 (D.C. Cir. 1990) ("*McKesson I*"); *McKesson Corp. v. Islamic Republic of Iran*, 52 F.3d 346, 347–50 (D.C. Cir. 1995) ("*McKesson II*"); *McKesson HBOC, Inc. v. Islamic Republic of Iran*, 271 F.3d 1101, 1104–05 (D.C. Cir. 2001) ("*McKesson III*"). Suffice it to say for purposes of this appeal that McKesson, an American company, is a significant shareholder in an Iranian dairy company called Sherkat Sahami Labaniat Pasteurize Pak ("Pak"). As alleged, Iran effectively froze out McKesson's stake in Pak and blocked its receipt of dividend payments. In 1982, McKesson filed suit in the United States District Court for the District of Columbia, alleging that Iran had unlawfully

expropriated its property without compensation. The Overseas Private Investment Corporation ("OPIC"), a federal agency that helps American businesses invest abroad, participated as a co-plaintiff because it had insured a significant portion of McKesson's stake in Pak. OPIC has since been dismissed from the litigation.

In our first two decisions, we held that McKesson had properly pleaded federal jurisdiction under the commercial activity exception of the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605(a)(2). *See McKesson I*, 905 F.2d at 449–51, 453; *McKesson II*, 52 F.3d at 350–51. In the third decision, we affirmed jurisdiction under the FSIA and also held that the 1955 Treaty of Amity, Economic Relations, and Consular Rights, Aug. 15, 1955, U.S.-Iran, 8 U.S.T. 899 ("Treaty of Amity"), between the United States and Iran provided McKesson a cause of action for expropriation. *McKesson III*, 271 F.3d at 1106, 1107–08. We remanded the case to the district court for a trial on two factual issues: whether Pak had instituted a so-called "come-to-the-company requirement" for the payment of dividends, and whether it would have been futile for McKesson to "come" to Pak to collect its dividends. *Id.* at 1108–10.

Iran petitioned the Supreme Court for certiorari to review *McKesson III*. Until then, OPIC had been represented by private counsel that had taken the position that the Treaty of Amity provided a cause of action. In the Supreme Court, the Solicitor General took over OPIC's representation and opposed certiorari, arguing that even though the Treaty of Amity did not provide a cause of action, certiorari was not appropriate because a final judgment had yet to be entered. The Court denied certiorari, and in light of the government's change in position we vacated "the portion of [*McKesson III*] addressing whether the Treaty of Amity between the United

States and Iran provides a cause of action to a United States national against Iran in a United States court," and instructed the district court "to reexamine that issue in light of the representation of the United States that it does not interpret the Treaty of Amity to create such a cause of action." *McKesson HBOC, Inc. v. Islamic Republic of Iran*, 320 F.3d 280, 281 (D.C. Cir. 2003) ("*McKesson IV*").

At issue on this appeal are the proceedings in the district court on remand from *McKesson III* and *McKesson IV*. The district court concluded that the Treaty of Amity provides a cause of action for McKesson. The court also denied Iran's motion for reconsideration of its 1997 decision that customary international law ("CIL")[1] provides a cause of action. The court then held a three-week bench trial on the two factual issues and ruled against Iran on both. Iran appeals, and we have jurisdiction under 28 U.S.C. § 1291. Iran urges us to revisit the question whether there is subject matter jurisdiction under the FSIA. Having thrice held that jurisdiction exists, we decline Iran's request. *McKesson I*, 905 F.2d at 449–51; *McKesson II*, 52 F.3d at 350–51; *McKesson III*, 271 F.3d at 1106; *see also LaShawn A. v. Barry*, 87 F.3d 1389, 1393 (D.C. Cir. 1996) (en banc) ("[T]he *same* issue presented a second time in the *same case* in the *same court* should lead to the *same result*.").

Iran argues that the district court erred by interpreting the Treaty of Amity to provide McKesson a cause of action, by denying its motion to reconsider the earlier CIL ruling, by misconstruing our remand mandate in *McKesson III*, and by

---

[1] CIL is occasionally referred to as the "law of nations." It "results from a general and consistent practice of states followed by them from a sense of legal obligation." RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW OF THE UNITED STATES § 102(2) (1986).

committing several errors during the trial. We reverse the district court on the first two issues, defer consideration of the remaining issues, and remand for further proceedings consistent with this opinion.

## II.

We must determine whether the Treaty of Amity provides a private cause of action. If it does, then McKesson's appearance as a plaintiff in federal court was a proper exercise of its "right . . . to seek judicial relief from injuries caused by another's violation of a legal requirement." *Cannon v. Univ. of Chi.*, 441 U.S. 677, 730 n.1 (1979) (Powell, J., dissenting). If it does not, and if a cause of action cannot otherwise be found, then McKesson's complaint must be dismissed. The district court concluded that McKesson had a cause of action under the Treaty of Amity. *McKesson Corp. v. Islamic Republic of Iran*, 520 F. Supp. 2d 38, 52–55 (D.D.C. 2007). Reviewing this interpretation de novo, we reverse. *See United States v. Al-Hamdi*, 356 F.3d 564, 569 (4th Cir. 2004) ("Interpretation of an international treaty is an issue of law subject to de novo review.").

To determine whether a treaty creates a cause of action, we look to its text. *See United States v. Alvarez-Machain*, 504 U.S. 655, 663 (1992) ("In construing a treaty, as in construing a statute, we first look to its terms to determine its meaning."). The Treaty of Amity, like other treaties of its kind, is self-executing. *See Medellín v. Texas*, 128 S. Ct. 1346, 1365–66 (2008); *Blanco v. United States*, 775 F.2d 53, 60 (2d Cir. 1985) (Friendly, J.); CURTIS A. BRADLEY & JACK L. GOLDSMITH, FOREIGN RELATIONS LAW 379 (2d ed. 2006) ("[C]ourts commonly assume that certain types of bilateral treaties, such as . . . Friendship, Commerce, and Navigation (FCN) treaties, are self-executing."). As such, it "operates of

itself without the aid of any legislative provision," *Foster v. Neilson*, 27 U.S. (2 Pet.) 253, 314 (1829) (Marshall, C.J.), and its text is "the supreme Law of the Land," U.S. CONST. art. VI, cl. 2, on par with that of a statute, *Whitney v. Robertson*, 124 U.S. 190, 194 (1888). That the Treaty of Amity is self-executing begins but does not end our search for a treaty-based cause of action, because "[w]hether a treaty is self-executing is a question distinct from whether the treaty creates private rights or remedies." RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW OF THE UNITED STATES § 111 cmt. h (1986) [hereinafter RESTATEMENT]; *accord Renkel v. United States*, 456 F.3d 640, 643 n.3 (6th Cir. 2006); *United States v. Li*, 206 F.3d 56, 67 (1st Cir. 2000) (en banc) (Selya & Boudin, JJ., concurring). "Even when treaties are self-executing in the sense that they create federal law, the background presumption is that '[i]nternational agreements, even those directly benefiting private persons, generally do not create private rights or provide for a private cause of action in domestic courts.' " *Medellín*, 128 S. Ct. at 1357 n.3 (quoting RESTATEMENT, *supra*, § 907 cmt. a).

We find nothing in the Treaty of Amity that overcomes this presumption. To be sure, article IV(2) of the Treaty of Amity directly benefits McKesson by declaring that "property shall not be taken except for a public purpose, nor shall it be taken without the prompt payment of just compensation." McKesson contends that the Treaty of Amity creates a right ("property shall not be taken") and provides a remedy ("just compensation"), and that together these make a cause of action. Not so. The Treaty of Amity tells us *what* McKesson will receive — money — but leaves open the critical question of *how* McKesson is to secure its due. For a federal court trying to decide whether to interject itself into international affairs, the Treaty of Amity's silence on this point makes all the difference. A treaty that "only set[s] forth substantive

rules of conduct and state[s] that compensation shall be paid for certain wrongs . . . do[es] not create private rights of action for foreign corporations to recover compensation from foreign states in United States courts." *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 442 (1989). And without a cause of action, McKesson cannot invoke federal judicial authority to pursue its desired remedy. *Cf.* HENRY M. HART, JR. & ALBERT M. SACKS, THE LEGAL PROCESS 137 (William N. Eskridge, Jr. & Philip P. Frickey eds., 1994) ("A right of action is a species of power — of remedial power. It is a capacity to invoke the judgment of a tribunal of authoritative application upon a disputed question about the application of preexisting arrangements and to secure, if the claim proves to be well-founded, an appropriate official remedy.").

It would be one thing if the Treaty of Amity explicitly called upon the courts for enforcement, as the Warsaw Convention does. *See* Convention for the Unification of Certain Rules Relating to International Transportation by Air, Oct. 12, 1929, 49 Stat. 3000, 137 L.N.T.S. 11 (declaring that "carrier[s] shall be liable for damage" to passengers and baggage (arts. 17, 18(1)); that "action[s] for damages" must be brought before certain courts (art. 28(1)); that "[t]he right to damages" lasts for two years (art. 29(1)); and that "passenger[s] or consignor[s] shall have a right of action" in cases of successive carriers (art. 30(3))); *see also Curtin v. United Airlines, Inc.*, 275 F.3d 88, 90 (D.C. Cir. 2001) ("Article 18 of the Warsaw Convention, an international air carriage treaty ratified by the United States in 1934, creates a cause of action against an air carrier for loss or damage to a passenger's checked baggage."); *cf. Key Tronic Corp. v. United States*, 511 U.S. 809, 822 (1994) (Scalia, J., dissenting) ("Surely to say that A shall be liable to B is the *express* creation of a right of action."). Federal court

participation is appropriate where the President, by and with the advice and consent of the Senate, makes a treaty declaring that money should change hands by way of judicial compulsion rather than executive negotiation. But unlike the Warsaw Convention, with its explicit references to "right[s] of action" and "action[s] for damages," the Treaty of Amity reflects no such determination.

Reasoning by analogy to the Takings Clause of the Fifth Amendment, McKesson next asks us to use our federal common law power to recognize an implied cause of action. The phrase "just compensation" appears in both the Treaty of Amity and the Takings Clause. *Compare* Treaty of Amity, art. IV(2) ("[P]roperty shall not be taken except for a public purpose, nor shall it be taken without the prompt payment of just compensation."), *with* U.S. CONST. amend. V ("[N]or shall private property be taken for public use, without just compensation."). McKesson urges us to infer a cause of action from the former, as the Supreme Court has from the latter. *See First English Evangelical Lutheran Church v. County of Los Angeles*, 482 U.S. 304, 316 & n.9 (1987); *United States v. Causby*, 328 U.S. 256, 267 (1946); *Jacobs v. United States*, 290 U.S. 13, 16 (1933).

This attempt to draw an analogy between a treaty and the Constitution is unsound. When it comes to implied causes of action, the Constitution stands apart from other texts. *See Davis v. Passman*, 442 U.S. 228, 241–42 (1979) (explaining that "the question of who may enforce a *statutory* right is fundamentally different from the question of who may enforce a right that is protected by the Constitution"); *Cannon*, 441 U.S. at 733 n.3 (Powell, J., dissenting) ("[T]his Court's traditional responsibility to safeguard constitutionally protected rights, as well as the freer hand we necessarily have in the interpretation of the Constitution, permits greater

judicial creativity with respect to implied constitutional causes of action."). Inferring a cause of action from the Constitution squares with the "presum[ption] that justiciable constitutional rights are to be enforced through the courts." *Davis*, 442 U.S. at 242. By contrast, inferring a treaty-based cause of action embroils the judiciary in matters outside its competence and authority. *See Medellín*, 128 S. Ct. at 1357 n.3 (noting presumption against finding treaty-based causes of action); *Sosa v. Alvarez-Machain*, 542 U.S. 692, 727 (2004) (noting that "a decision to create a private right of action is one better left to legislative judgment in the great majority of cases," and that "the possible collateral consequences of making international rules privately actionable argue for judicial caution"); *Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774, 799, 801–08 (D.C. Cir. 1984) (Bork, J., concurring) (arguing that separation-of-powers concerns counsel against inferring treaty-based causes of action). Our conclusion that the Treaty of Amity does not create an implied cause of action accords with the prevailing sentiment against recognition of implied causes of action. *See, e.g.*, *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61 (2001) (refusing to extend *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971), to provide cause of action against private party); *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001) ("Like substantive federal law itself, private rights of action to enforce federal law must be created by Congress."); *FDIC v. Meyer*, 510 U.S. 471 (1994) (refusing to extend *Bivens* to provide cause of action against federal agency); RICHARD H. FALLON, JR. ET AL., HART AND WECHSLER'S THE FEDERAL COURTS AND THE FEDERAL SYSTEM 781–83, 816–21 (5th ed. 2003) (describing retrenchment of implied causes of action in statutory and constitutional contexts).

In the absence of a textual invitation to judicial participation, we conclude the President and the Senate

intended to enforce the Treaty of Amity through bilateral interaction between its signatories. We give " 'great weight' " to the fact that the United States shares this view. *Medellín*, 128 S. Ct. at 1361 (quoting *Sumitomo Shoji Am., Inc. v. Avagliano*, 457 U.S. 176, 184–85 (1982)); *see* United States Amicus Br. at 5–11 (arguing that the Treaty of Amity does not create a cause of action). This interpretation is in keeping with traditional assumptions about how treaties operate. As the Supreme Court declared in *The Head Money Cases*:

> A treaty is primarily a compact between independent nations. It depends for the enforcement of its provisions on the interest and the honor of the governments which are parties to it. If these fail, its infraction becomes the subject of international negotiations and reclamations, so far as the injured party chooses to seek redress, which may in the end be enforced by actual war. It is obvious that with all this the judicial courts have nothing to do and can give no redress.

*Edye v. Robertson (The Head Money Cases)*, 112 U.S. 580, 598 (1884). The Treaty of Amity does not provide a cause of action. We must leave to the political branches the implementation of its just compensation guarantee.

## III.

We reverse the district court's ruling that McKesson has a cause of action under the Treaty of Amity. In light of this conclusion, we remand for the district court to decide whether this suit can proceed. The court shall consider three issues. First, the district court must consider whether McKesson has a cause of action under Iranian law. McKesson has so contended in the district court, but the court has had no reason

to address the issue before now. Second, it must reconsider, in light of, *inter alia*, the Supreme Court's intervening decision in *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004), whether CIL provides McKesson a cause of action. Third, it must determine whether the act of state doctrine applies to this case. "The act of state doctrine 'precludes the courts of this country from inquiring into the validity of the public acts a recognized foreign sovereign power committed within its own territory.' " *World Wide Minerals, Ltd. v. Republic of Kazakhstan*, 296 F.3d 1154, 1164 (D.C. Cir. 2002) (quoting *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 401 (1964)). The doctrine must be addressed before this litigation is completed because if it applies Iran cannot be held liable. On the latter two issues, the district court shall invite the views of the United States, whose interests may be implicated by those matters. Because it is unclear whether McKesson's suit may proceed, we defer for now Iran's challenges to the district court's interpretation of the remand order in *McKesson III* and its rulings at trial.

*So ordered.*